UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LINDSAY DROZ,

               Plaintiff,

   v.

BOSTON SCIENTIFIC
CORPORATION,

               Defendant.

CASE NO. 2:20-CV-48-RSM-DWC

REPORT AND RECOMMENDATION

**Noting Date: February 11, 2021**

      The District Court has referred this employment discrimination action to United States Magistrate Judge David W. Christel. This matter comes before the Court on Defendant Boston Scientific Corporation's (BSC) Motion for Summary Judgment. Dkt. 47. Plaintiff, Lindsay Droz (Droz), opposes the motion. Dkt. #53. For the reasons discussed below, the Court recommends Defendant's Motion for Summary Judgment be GRANTED, and the pending Motion to Exclude Expert Testimony (Dkt. 45) be DENIED as moot.

///

///

REPORT AND RECOMMENDATION - 1

**BACKGROUND**

On January 10, 2020, BSC removed to this Court Droz's Complaint, originally filed in King County Superior Court on November 26, 2019, alleging discrimination on the basis of sex and retaliation for making complaints of discrimination, both in violation of the Washington Law Against Discrimination (WLAD). RCW 49.60.180(3); RCW 49.60.210.

On March 12, 2020, Droz filed an Amended Complaint, realleging the above claims, and adding a Constructive Discharge claim. Dkt. 23. Droz seeks money damages for lost past and future income, and emotional distress. *Id*.

On March 26, 2021, BSC Answered Droz's Amended Complaint. Dkt. 24.

On July 23, 2020, Droz filed a Motion to Compel BSC to produce "comparator" evidence (Dkt. 27), which this Court granted on September 1, 2020 (Dkt. 36). On September 15, 2020, BSC filed a Motion for Reconsideration ordering BSC to pay Droz's reasonable expenses incurred in moving to compel. Dkt. 37. On October 5, 2020, Chief Judge Ricardo S. Martinez denied reconsideration, and granted, in part, Droz's Motion for Attorney fees. Dkt. 43.

On December 9, 2020, BSC filed under seal a Motion to Exclude Expert Testimony (Dkt. 45), and on December 21, 2020, Droz lodged her opposition (Dkt. 51). BSC replied on December 28, 2020. Dkt. 52. This motion is still pending.

On December 9, 2020, BSC also filed the instant Motion for Summary Judgment (Dkt. 47), which Droz Responded to in opposition on December 28, 2020 (Dkt. 53). BSC replied on January 4, 2021. Dkt.59.

On December 28, 2020, Droz filed a Motion to Seal Exhibits. Dkt. 56. On January 13, 2021, BSC Responded in opposition to Droz's Motion to Seal. Dkt. 61. Droz replied on January 15, 2021. Dkt. 63.

REPORT AND RECOMMENDATION - 2

1    On January 21, 2021, this Court held oral argument. The Court DENIED the Motion to

2  Seal and directed Plaintiff to refile the exhibits originally filed under seal at docket entry 57,

3  after redacting the entire line of text beginning with the name of any BSC employee not already

4  referenced in the pleadings, in addition to refiling the exhibits originally filed at docket entry 55,

5  such that all of Plaintiff's exhibits relevant to this motion are located at docket entry 65. *See* Dkt.

6  64.

7                                    **FACTS**[1]

8    In 2005, Droz began working for BSC in its Interventional Cardiology division for the

9  Pacific Northwest Region (PNW). According to Droz, BSC's sales divisions are overwhelmingly

10  male and have a pervasive "boys club" culture, and women are overwhelming in the minority.

11  Dkt. 23 at 2. Droz avers that she was subjected to differential treatment on the basis of her sex

12  from the outset, such as when a male colleague repeatedly called her "the skirt," "honey," and

13  "sweetie" circa 2007, and her complaint to management was met with the admonition to "deal

14  with it" and avoid putting such accusations in writing because they can "get people fired." *Id.*

15    In 2010, Droz moved to the Electrophysiology (EP) Division in 2010, reporting to Brandi

16  Bentley (Bentley), the PNW EP Regional Manager. Dkt. 23 at 3. Bentley oversaw both the

17  PNW's EP representatives, as well as six other regional managers. Between 2010 and 2015,

18  Bentley modified Droz's territory several times, yet Droz was consistently ranked as a top EP

19  sales representative during this period, even winning the "President's Club" award in 2012 and

20  2013. Dkt. 49-1 at 122-124.

21

22  _____

23        [1] For narrative continuity this Court includes all relevant facts alleged by each party. However, only
admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America, NT &
SA,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e).

24

REPORT AND RECOMMENDATION - 3

1    In 2015, BSC combined the EP and Cardiac Rhythm Management (CRM) divisions to

2  form a nationwide Rhythm Division. Dkt. 28 at 2. The Rhythm Division included: (a) sales

3  representatives who sell EP products; (b) sales representatives who sell CRM products; and (c)

4  sales representatives who sell both EP and CRM products. *Id.* CRM and EP sale representatives

5  share the same Regional Managers, all of whom report to the Area Director within the Rhythm

6  Division. *Id.* In the Pacific Northwest Region the Area Director was Ken Crowley (Crowley). *Id.*

7    During Q1 of 2015, Bentley left her position. Dkt. 49-1 at 41. Bentley did not

8  recommend anyone on her team (including Droz) to be her replacement, so Crowley worked

9  with human resources (HR) to publicly post the position. Dkt. 49-2 at 23. Crowley sought a

10  candidate with both management and CRM experience, since CRM was the future of the

11  company**.** *Id.* According to Crowley, he did not interview Droz because she was not qualified.

12  Dkt. 49-2 at 26. According to Droz, she flew to Los Angeles to be interviewed by Crowley for

13  Bentley's open position, only to have Crowley cancel the interview, stating that it was not the

14  right time for Droz to become a manager because she would be busy with the baby she was

15  pregnant with. Dkt. 49-1 at 46. In response, Droz claims she told Crowley she believed BSC

16  needed to do a better job promoting women into management. *Id.*

17    In 2016, BSC moved EP sales representatives, such as Droz, under the same regional

18  managers as CRM representatives. Dkt. 49-2 at 36. Thus, in July 2016, Droz began reporting to

19  Brett Britton (Britton). *Id.* Soon thereafter, in December 2016, Droz's territory was modified

20  again. Droz claims five of her largest accounts were reassigned to men whom she claims were

21  from the CRM division and lacked her expertise in EP sales. Dkt. 23 at 3. As a result of these

22  territory changes Droz's sales decreased, as did her compensation. *Id.* Droz claims the men who

23  were assigned to her accounts all experienced an increase in compensation. *Id.*

24

REPORT AND RECOMMENDATION - 4

According to Crowley, the reassignment of Droz's accounts at this moment in time was part of a sales strategy that involved the entire PNW team. Because BSC's EP sales team was significantly smaller than its competitors, BSC needed to shrink the territory that each sales representative covered in order to efficiently introduce the new Rhythmia products to every hospital that had the volume of ablation cases to justify the investment. Dkt. 49-2 at 36. Every Rhythmia system sold to a hospital required a BSC clinical mapper to operate it during ablation procedures and required the EP sales representative to sell $350,000 per year in Rhythmia disposables to that hospital. *Id.* at 35; Dkt. 49-23 at 5. Consequently, Crowley modified EP sales representatives' territories to focus on areas where there was high growth potential. Dkt. 49-2 at 40.

Crowley and Britton focused Droz's territory on the Seattle area where there was great potential for Rythmia growth, and reassigned to CRM representatives Droz's hospital accounts that held less potential to perform ablations, including Jason Bleick, Geoff Trano, Kris Lippert, and Zenia Bringhurst (female) who served as hybrid CRM/EP representatives. Dkt. 49-2 at 41, 62. Crowley employed the same strategy to the other EP sales representative—Collin Dean— focusing his territory in Utah and hybridizing the remainder. Dkt. 49-4 at 3. Beyond the PNW, other areas followed suit: by Q1 2017, BSC had 34 EP representatives and 57 hybrid representatives. Dkt. 49-7 at 3-4.

To offer stability to its sales staff during this time of big territory changes BSC offered many of them an employment agreement (EA). BSC offered Droz an EA for 2017 and 2018 that set a floor for her commission, limiting her downside. Dkt. 49-12. Droz rejected it, believing the compensation was insufficient when compared to employment agreements offered to male colleagues throughout the country and within the PNW Region combined EP/CRM division. *Id.*;

Dkt. 49-1 at 70. Accordingly, Droz refused to sign an EA, telling Crowley and Britton that she wanted "to be treated like the boys" and "all the other top performers." Dkt. 49-16. Britton then forwarded to Droz a press release about an LGBTQ Equality award BSC had recently received. *Id*. Droz replied, reiterating her request to be treated like "all the other top performers." *Id*.

Droz struggled to adjust to selling Rhythmia. By the end of 2016, her performance had declined from 135.8% to quota in 2015 to 95.4% in 2016. Dkt. 49-18. The fourth quarter of 2016 was particularly poor, with Droz achieving only 77.2% to quota. *Id*. In her 2016 performance review, Droz was encouraged to continue focusing on a strong Rhythmia pipeline in 2017. *Id*.

In March 2017, Britton left his role as the Regional Manager for the Seattle Region of the PNW. Dkt. 49-1 at 41. Crowley again worked with HR to post a job opening and conducted interviews. Dkt. 49-2 at 45. Droz applied for the position belatedly – after the application window had closed. *Id*. Nonetheless, Crowley interviewed her, along with two other female candidates and three male candidates. *Id*. Ultimately, Crowley hired a female candidate named Cathy Sassin (Sassin), who was a Field Clinical Manager based in Oregon, reporting to Mark Hoy (Hoy), Regional Manager of the Cascade Region. *Id*.

Droz continued to struggle selling Rhythmia, failing every quarter of 2017 to meet quota. Dkt. 49-6. In September 2017, Droz sold a Rhythmia system to one of her largest accounts— Swedish Hospital—utilizing a unique agreement: rather than paying cash, Swedish agreed to use the system a set number of times per quarter for a term of years, after which time it would be considered paid for**.** Dkt. 49-3 at 46. However, the launch went poorly when the physician who performed one of the first ablations did not undergo the recommended training from Droz and ended up fatally perforating a patient's heart. Dkt. 49-2 at 50**.**

1    Droz believes this incident is to blame for her poor Q4 results: at just 51.1% to quota, she

2    was the lowest ranked sales representative on Hoy's team, 45th out of 46 representatives in the

3    PNW, and 29th out of 33 EP representatives nationwide. Dkt. 49-5, 49-6, 49-7. Droz's 51.1% to

4    quota finish in Q4 lagged significantly behind the nation: company-wide EP sales reached 87.8%

5    to quota that quarter. Dkt. 49-7 at 7. For the year, Droz fared little better, finishing at 81.9% to

6    quota, compared to the nation's 92.1% to quota in 2017. Dkt. 49-31. Droz was again the lowest

7    ranked sales representative on Hoy's team, 42nd out of 46 representatives in the PNW, and 25th

8    out of 28 eligible EP representatives nationwide in the President's Club. Dkt. 49-5, 49-6, 49-11.

9    In November 2017, Crowley held his annual "calibration" meeting with all regional

10    managers from the PNW to discuss sales representative performance. Dkt. 49-2 at 18. The group

11    reviewed sales metrics and assigned each representative an "outstanding," "successful," or

12    "needs improvement" rating. *Id*. at 18-19. Per company guidance, 10% received a "needs

13    improvement," 70% a "successful," and 20% an "outstanding" rating. *Id*. Droz, who not only fell

14    short of quota all four quarters but was also in the bottom 10% of the PNW for quota attainment,

15    was assigned a "needs improvement" rating. Dkt. 49-18.

16    Droz was not informed of her "needs improvement" rating until late-February 2018, after

17    completing the self-evaluation portion of her annual review. Dkt. 49-19. Droz claims she was

18    given the "needs improvement" rating because of what she wrote in her self-evaluation.

19    Specifically, Droz wrote,

20    　　　There is a need for Boston to increase its pipeline of strong
　　　representatives that show a desire for management and getting them
21    　　　prepped for success of management. This is non existent [sic] at this
　　　point. Boston has no formal mentorship program or management
22    　　　training/networking and I would like to work with someone in
　　　corporate to help direct some of this change. One thing that I
23    　　　personally would like to be a part of [sic] is moving Boston towards
　　　hiring more females and diverse candidates and getting them into

24

REPORT AND RECOMMENDATION - 7

1
2
3

> leadership positions. Currently, Boston falls short in hiring female managers and directors and other leadership roles in comparison to other top Fortune companies. Anything I can do from a pro-active standpoint to develop and help create more of an opportunity for myself and other talented females is something I would aspire to do.

4    Dkt. 49-18. BSC maintains that the "needs improvement" rating was set by the team during the

5    November 2017 meeting. Dkt. 49-2 at 19.

6        Hoy's portion of Droz's 2017 review noted that Droz had now missed quota in 2016 and

7    2017. Dkt. 49-18. Hoy called out her poor disposable sales: she achieved only 78% of her

8    disposable plan, with an 11% decline in revenue compared to 2% national growth. *Id*. Hoy

9    encouraged Droz to focus on disposable sales each quarter of 2018. *Id*. With Droz's permission,

10   Hoy also forwarded Droz's self-evaluation comments to Margaret Martin, HR Director, stating,

11   "Lindsay said it was OK if I shared her PDC comments with you. Maybe there is an opportunity

12   for Lindsay to work on a diversity project?" Dkt. 49-20. A couple months later, Judith Aube, an

13   HR Representative, contacted Droz and recommended she join the "Building Management

14   Potential" program offered by BSC. Dkt. 49-1 at 83. Droz did not join this program**.** *Id*.

15       By the first half of 2018, Droz's performance had not improved. She did not meet her

16   total EP quota, disposable quota, or capital quota in Q1 or Q2 and was trending 77% to quota for

17   the year. Dkt. 49-21. Therefore, on July 10, 2018, Hoy issued her a Verbal Corrective Action

18   (VCA). *Id*. The VCA outlined Droz's historic sales performance and set forth several goals for

19   Q3, including: (1) 95% of total quota; (2) 100% of disposables quota; and (3) 80% of Swedish

20   Hospital's Rhythmia disposable commitment. *Id*.

21       Droz showed improvement in the third quarter of 2018. While Droz did not meet 100%

22   of her total disposables quota or 80% of her Swedish Hospital commitment, she achieved 113%

23   to total EP quota for the quarter. Dkt. 49-24. Though Hoy had the discretion to escalate Droz to

24

further corrective action for failing to meet her sales goals, instead he removed Droz from the VCA on October 1, 2018, with the stated expectation that she meet 100% of her total EP quota and at least 95% of her disposable quota in Q4. Dkt. 49-24.

Droz's Q3 improvement was fleeting. In Q4 Droz achieved only 89.8% of total EP quota, 80% of total disposable quota, and just 36% of Rhythmia disposable quota. Dkt. 49-25. Bolstered by her successful Q3, Droz finished the year at 89.1% to quota, ranking 12 out of 13 representatives on Hoy's team, 31 out of 43 representatives in the PNW, and 21 out of 31 eligible EP representatives in the President's Club. Dkt. 49-5, 49-6, 49-11. Hoy noted that Droz had missed total EP quota for three years and had achieved her total disposable plan only once in eight quarters. *Id*. Hoy noted, again, that Droz's Rhythmia disposable sales were "her most critical miss" and encouraged her to focus on it every quarter in 2019. *Id*.

During the first quarter of 2019, Stephanie McDonald (McDonald) replaced Crowley as the Area Director for the PNW. Dkt. 49-2 at 63. When Droz's metrics did not improve during the Q1 of 2019, on April 30, 2019, Hoy placed Droz on a Written Corrective Action (WCA). Dkt. 49-26. The WCA was focused on Droz's Rhythmia disposable sales, which had lagged behind the PNW and the nation for five consecutive quarters despite repeated counseling. *Id***.** For Q2 2019, Droz was expected to achieve, in part: (1) 100% of her EP Plan; (2) 100% of her total disposable plan; (3) at least 90% of her Rhythmia disposable plan; and (4) at least five cases at Swedish Hospital in May and June. *Id*.

Two weeks later, on May 15, 2019, Droz wrote an email to HR with the subject line "Concerns of retaliation and discrimination." Dkt. 49-27. Droz complained about several actions, including: the 2016 territory changes, the 2016 EA offer, her 2017 "needs improvement"

1  performance rating, and her VCA and WCA. *Id*. Droz indicated that she believed she was being

2  retaliated against for saying BSC needs to do a better job hiring and promoting women. *Id*.

3      BSC conducted a full investigation into Droz's allegations and concluded there was no

4  evidence of retaliation or discrimination. Dkt. 48 ¶ 3.

5      Droz did not meet any of the sales goals for Q2 of 2019 outlined in her WCA plan,

6  finishing the quarter only 77% to total plan and 53% to plan for Rhythmia disposable sales. Dkt.

7  49-7 at 13. On July 16, 2019, shortly before meeting with her supervisors to discuss these results,

8  Droz took a leave of absence. Dkt. 49-28. When her leave time elapsed, HR offered Droz three

9  options: (1) apply for long term disability benefits; (2) return to work; or, (3) request a

10 reasonable accommodation. Dkt. 49-1 at 17. Droz did not pursue any of these options, and

11 instead resigned on February 11, 2020**.**

12                    **<u>LEGAL STANDARD</u>**

13      Summary judgment is proper only if the pleadings, discovery, and disclosure materials on

14 file, and any affidavits, show that there is no genuine dispute as to any material fact and that the

15 movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

16 entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17 showing on an essential element of a claim in the case on which the nonmoving party has the

18 burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of

19 fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

20 the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

22 metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a

23 material fact exists if there is sufficient evidence supporting the claimed factual dispute,

24

1   requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

2   *Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

3   626, 630 (9th Cir. 1987).

## DISCUSSION

### I.  Discrimination Based on Sex

6       A plaintiff may respond to a motion for summary judgment on her claim of

7   discrimination on the basis of sex by producing direct or circumstantial evidence "that a

8   discriminatory reason more likely than not motivated the employer," (*Metoyer v. Chassman*, 504

9   F.3d 919, 931 (9th Cir. 2007)), or by using the burden-shifting framework of *McDonnell*

10  *Douglas Corp. v. Green*, 411 U.S. 792 (1973).

11      Under the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case of

12  employment discrimination. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007); *see also*

13  *Blackburn v. State*, 186 Wash.2d 250, 257-58 (2016). If she succeeds, "the burden of production,

14  but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory

15  reason for the challenged action." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115,

16  1123–24 (9th Cir. 2000). If the defendant meets this burden, the plaintiff must then raise a triable

17  issue of material fact as to whether the defendant's proffered reasons for its action are mere

18  pretext for unlawful discrimination. *Noyes*, 488 F.3d at 1168.

19      Droz does not produce evidence that the actions taken by BSC were, more likely than

20  not, motivated by a discriminatory reason. Accordingly, her claim of discrimination based on sex

21  must be analyzed using the *McDonnell Douglas* framework.

22      Under the *McDonnell Douglas* framework Droz must establish a prima facie case by

23  showing she: (A) is a member of a protected class; (B) is qualified for the position or performing

24

substantially equal work; (C) suffered an adverse employment action; and, (D) that

similarly situated employees not in her protected class received more favorable treatment.

*Matson v. United Parcel Serv., Inc.*, 872 F.Supp.2d 1131, 1137 (W.D. Wash. 2012)

(applying the *McDonnell Douglas* framework to a claim of discrimination on the basis of

gender pursuant to RCW 49.60.180).

### A.    Protected Class

There is no dispute that Droz is a member of a protected class (women).

### B.    Qualified

Next, Droz must show she was qualified for the positions she claims BSC unlawfully

denied her. At oral argument counsel for Droz conceded that the statute of limitations applicable

to claims under RCW 49.60.180 is three years, so only allegedly discriminatory acts that

occurred on or after November 26, 2016, are relevant here. Dkt. 47 at 15. Consequently, Droz's

original claim that BSC failed to promote her in 2015 to the position Tony Dyba was hired for is

untimely, and Droz fails to satisfy this element.

### C.    Adverse Employment Action

Third, Droz must show she suffered an adverse employment action. Droz identifies the

following as adverse employment actions not barred by the statute of limitations: (i) the 2016

territory cuts; (ii) the 2016 EA offer she did not sign; (iii) the 2018 "needs improvement"

performance rating; (iv) the 2018 verbal corrective action (VCA); and, (v) the 2019 written

corrective action (WCA).

An adverse employment action must involve a "material" change in employment

conditions that is "more than an inconvenience or alteration of job responsibilities." *Knight v.*

*Brown*, 797 F.Supp.2d 1107, 1130 (W.D.Wash. 2011); *Tyner v. State*, 137 Wash.App. 545, 564

1    (2007) (internal citations omitted). The Ninth Circuit has recognized that "non-trivial"

2    employment actions, such as "termination, dissemination of a negative employment reference,

3    issuance of an *undeserved* negative performance review and refusal to consider for promotion,"

4    qualify as adverse employment actions. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.

5    2000)(emphasis added). Employment actions (including performance improvement plans and

6    account redistributions) that do not negatively impact the terms, conditions, or privileges of

7    employment and do not limit an employee's earning potential are not adverse employment

8    actions. *James v. C-Tran*, 130 Fed.Appx. 156, 157 (9th Cir. 2005) ("Because the performance

9    improvement plan was non-disciplinary training that did not materially impact James's

10   compensation, terms, conditions, or privileges of employment, it was not an adverse employment

11   action.").

12       **(i) The 2016 Territory Cuts**

13       At oral argument counsel for Droz argued the 2016 territory reassignments were akin to a

14   job reassignment. Yet, prior to 2016, Droz accepted territory reassignments and account

15   redistributions as commonplace for both male and female sales representatives, admitting that

16   her territory changed many times under female manger Bentley's leadership, from 2010 to 2015.

17   Dkt. 49-1 at 122-124. However, Droz does not include these changes in her complaint. In any

18   event, Droz has not shown that territory changes impacted the terms, conditions, or privileges of

19   employment.

20       **(ii) The 2016 EA Offer**

21       Droz does not explain how the offer of an employment agreement that would guarantee

22   base pay in exchange for a two-year commitment, and offer incentive pay based upon percent to

23   quota attainment, constitutes an adverse employment action. *See* Dkt. 49-3 at 26; Dkt. 49-12.

24

1  Instead she points out that other sales representatives were offered EAs with different terms

2  (discussed further, below). Regardless, Droz rejected the EA offer so it did not, in fact, have any

3  impact on the terms, conditions, or privileges of her employment.

4      **(iii) The 2018 "Needs Improvement" Performance Rating**

5      Droz offers no evidence or argument that the "needs improvement" rating communicated

6  through Hoy via her annual review of fiscal year 2017, had any impact on the terms, conditions,

7  or privileges of her employment.

8      **(iv) The 2018 VCA and (v) The 2019 WCA**

9      Droz offers no evidence that the 2018 VCA or the 2019 WCA had any impact on the

10  terms, conditions, or privileges of her employment. At oral argument counsel for Droz postulated

11  that the corrective action plans effectively changed the terms of her job by requiring her to do

12  things she was not doing before. The Court has reviewed the VCA and WCA plans and finds no

13  basis to support this argument.

14      The plans required Droz to take specific steps to improve her sales numbers, and

15  to create a strategy (with help from Hoy and Crowley) for increasing her knowledge and

16  comfort with Rhythmia, a product the plans described as BSC's "number one business

17  priority." Dkt. 49-26 at 5; *see also* Dkt. 49-21. In other words, the plans basically

18  describe the job Droz should have been doing since the Rhythmia mapping system was

19  introduced in 2015.

20      Droz also argues that an email Crowley sent to another BSC employee a couple months

21  after Droz received the 2018 VCA, noting that another BSC employee looking to make an

22  internal change might be a good fit for Droz's position (should Droz prove incapable of

23  correcting course) is evidence that Crowley was already planning to terminate Droz. Dkt. 55-5.

24

The Court has reviewed this email and finds, first, that it did not have any impact on the terms, conditions or privileges of Droz's employment, and second, that forecasting for Droz's potential departure was in no way discriminatory.

While Droz's ongoing failure to meet her quotas likely would have resulted in her termination, had she not resigned, the corrective action plans were designed to prevent that from happening by assisting her in making positive changes. To be sure, the 2018 VCA plan initially served this purpose, and on October 1, 2018, Droz was released from it with a reminder to "maintain or exceed the level of sales activity [she] demonstrated during Q3 2018 and continue to achieve [her] various sales plans." Dkt. 49-24 at 3. Droz did not succeed in sustaining her initial improvements, so on April 30, 2019, the WCA plan provided further guidance and requirements, notably indicating that Droz's most significant problem was her poor "Rhythmia Disposable" performance, and that her "lack of urgency…[to] improve [her] technical and sales knowledge on Rhythmia and its products is of great concern." Dkt. 49-26 at 3, 5.

In sum, the Court finds that Droz has failed to meet her burden of showing she suffered an adverse employment action.

### D. <u>Similarly Situated Men More Favorably Treated</u>

Finally, Droz must show that similarly situated employees not in her protected class—men—received more favorable treatment.

According to Droz, similarly situated men were treated more favorably than she was in the following ways: (i) in December 2016, her sales territory and earning potential was cut in half and given almost entirely to unqualified men; (ii) although Colin Dean (Dean)—the other EP sales representative in Crowley's area—also experienced territory changes, Droz's territory was cut significantly more than Dean's; (iii) BSC offered Droz an employment agreement that

1  was disproportionately lower than similarly situated men; and, (iv) male sales representatives

2  with similar performance issues were not placed on corrective action plans like she was. Dkt. 53

3  at 20-21.

4          Individuals are similarly situated to a plaintiff (i.e., comparators) "when they have similar

5  jobs and display similar conduct." *Walech v. Target Corp.*, 2:11-CV-254-RAJ, 2012 WL

6  1068068, at *8 (W.D.Wash. Mar. 28, 2012) (comparator evidence relevant "when other

7  employees work at the same part of the company as plaintiff, have the same performance,

8  qualifications, and conduct, and have a common supervisor"). The test is not simply that the

9  employees share the same job title. *Id.*; *see also Lauer v. Longevity Med. Clinic PLLC*, 2:13-CV-

10  860, 2014 WL 5471983, at *5 (W.D. Wash. Oct. 29, 2014) (finding that to be "comparators,"

11  "[c]oworkers need not have the same supervisor or job title as long as they are subject to the

12  same behavioral standards and subject to disciplinary decisions made by the same decision-

13  maker"). As this Court has already determined, the question is not whether comparators align on

14  all material respects, but whether they align on sufficient factors in a material way. *See* Dkt. 36.

15          **(i)      December 2016 Territory Cuts**

16          Droz argues that in 2016 her territory was cut more than similarly situated men, and some

17  of her largest accounts were reassigned to male sales representatives in the CRM division who

18  had no experience with EP. Dkt. 53 at 6-7.

19          As previously mentioned, in 2016, BSC rearranged everyone's territory in the PNW

20  region as part of a strategy to efficiently introduce the new Rhythmia products to every hospital

21  that had the volume of ablation cases to justify the investment. Dkt. 49-2 at 36. Crowley and

22  Britton focused Droz's territory on the Seattle area where there most ablation cases occurred in

23  the region, and reassigned Droz's hospital accounts with less potential to perform ablations to

24

1  male and female CRM/EP representatives. Dkt. 49-2 at 41, 62. Crowley employed the same

2  strategy to restructuring Dean's territory. Dkt. 49-4 at 3. As for Droz's old accounts, BSC avers

3  both male and female sales representatives were assigned to them, just as Droz replaced male

4  sales representatives on accounts in her new territory. Dkt. 49-2 at 41.

5      Therefore, Droz has not established that similarly situated men were treated more

6  favorably than she was during the 2016 territory changes.

7      **(ii)    Colin Dean**

8      Droz nonetheless maintains Dean fared better than she did in the 2016 territory changes

9  because when comparing her Q1 2016 quota assignment to her Q1 2017 quota assignment[2], she

10  experienced a bigger decrease in quota than Dean. Dkt. 53 at 20.

11      According to BSC, quota is not measured by the geographic footprint of a sales

12  representative's territory, so territory changes, alone, do not determine quota. Instead, the VP of

13  Sales sets an annual target for EP sales, and in response area directors present sales plans to the

14  VP explaining the challenges and opportunities his or her territory will face in the year before

15  being assigned a portion of the total target. Dkt. 33 at 3. Area directors then assign each regional

16  manager a regional sales target based on regional-specific considerations. *Id*. Thus, the 2016

17  territory changes, alone, did not account for the quota decrease Droz complains of.

18      BSC shows that Droz's quota was consistently in the mid-range of EP sales

19  representatives nationwide, and both male and female EP representatives had higher quotas than

20  she did. Dkt. 49-8, 49-9. Moreover, the quarters Droz selected to compare herself to Dean were,

21

22  ────────────────

23     [2]According to Droz, Dean went from $904,000 in the first quarter of 2016 to $640,000 in the first quarter of
2017 (a difference of $264,000), whereas Ms. Droz went from $1.15 million in the first quarter of 2016 to $723,000

24  in the first quarter of 2017 (a difference of $429,000). Dkt. 53 at 20.

1   according to BSC, intended to mislead the Court because Droz's quota assignment hit an all-time

2   high in Q1 2016. Dkt. 49-7. Had Droz instead started with Q2 2016, the difference would only

3   be $180,000 for Droz and $324,000 for Dean**.** *Id.* Taking the averages of all four quarters shows

4   Dean actually experienced the bigger quota decrease. *Id.*

5          In sum, Droz has not shown Dean was treated more favorably in the 2016 territory

6   changes.

7          **(iii)    The Employment Agreement (EA)**

8          Droz argues similarly situated men received more generous EA offers, which is why she

9   refused to sign the one offered to her. However, Droz does not explain why she chose the two

10  EAs offered into evidence to prove this point, or how those men were proper comparators. *See*

11  Dkt. 65-4; Dkt. 65-8. Nor does she address BSC's rebuttal that EA offers were generated by a

12  corporate compensation team that employed a uniform formula that did not take gender into

13  account. Dkt. 49-13. Instead, BSC calculated what a sales representative would earn if they hit

14  100% to quota for each of their expectations, then used 75-80% of that metric as guaranteed

15  compensation for an EA. *Id.*

16         In short, Droz has not shown a genuine dispute whether similarly situated men received

17  more generous EAs than she did.

18         **(iv)    No Corrective Action Plans for Poor Performing Men**

19         Droz lists a number of men she claims were suffering from similarly poor performance

20  but were not subjected to corrective actions like she was.[3] Even assuming, without deciding, that

21

22  ──────────────────

23         [3] Droz identifies them as Bradley Mitchell, Scott Lange, Justin Shum, Warren (Jim) Bauer, Travis
    Dunn, Craig Lawrence, Kristopher Whitehead, William Hansen, Aaron Boaz, Michael Mamot, Bradley
24  Watts, Patrick Shea, Michael Dicenso, Robert Ziegler, Jason Doleac, and Jerad Cardoza. Dkt. 53 at 20-21.

REPORT AND RECOMMENDATION - 18

the men Droz points to are proper comparators, according to BSC records many of them were, in fact, subjected to corrective actions. BSC shows Dean (again, the only other EP sales representative in the PNW) received a "needs improvement" rating when he failed to meet quota every quarter of 2016. Dkt. 48 ¶ 2. He then failed to meet quota again in Q1 of 2017, at which point he resigned. *Id*.

Dean's replacement, Patrick Packer, also failed to meet quota all four quarters of 2019, at which point he, too, received a "needs improvement" rating. Dkt. 48 at 3. In addition, Hoy recalls issuing verbal corrective actions and/or written corrective actions to at least four other male sales representatives after they first received "needs improvement" ratings during the same timeframe as Droz. Dkt. 49-3 at 11-12. However, Hoy did not have any sales employees reporting to him who had a history of failing to meet plan that was comparable to Droz, who failed to meet her quota for six consecutive quarters. Dkt 49-3 at 44.

In sum, this Court finds Droz has failed to create a material question of fact that similarly situated men were treated more favorably. Having failed to meet her burden on three of the four elements, Droz cannot survive summary judgment on her sex discrimination claim. Accordingly, BSC is entitled to summary judgment on this claim.

## II. **Retaliation**

The WLAD prohibits retaliation for reporting discrimination. RCW 49.60.210. Courts use a three-step burden-shifting framework to determine whether a retaliation claim should survive summary judgment. *Francom v. Costco Wholesale Corp*., 98 Wash.App. 845 (2000).

Plaintiff must first establish a prima facie case, which requires proof that: (A) Plaintiff engaged in protected activity; (B) she suffered an adverse employment action; and, (C) there is a

1  causal connection between the two. *Trizuto v. Bellevue Police Dept*., 983 F.Supp.2d

2  1277, 1289 (W.D. Wash. 2013).

3      **A.**    **Protected Activity**

4      First, Droz must prove she engaged in protected activity. Droz claims she engaged in

5  protected activity by: (1) raising concerns about female advancement to Crowley in April or May

6  of 2015; (2) saying "I want to be treated like the boys," and "I want to be treated like other top

7  performers," to Crowley and Britton in December 2016; (3) writing on her 2017 self-evaluation

8  that BSC needs to do a better job recruiting and promoting women; (4) complaining of gender

9  discrimination to Hoy beginning in February 2018; and, (5) writing a formal complaint to HR in

10  May 2019. Dkt. 49-27.

11      Under the WLAD, statutorily protected activity is defined as "oppos[ing] any practices

12  forbidden by" it. RCW 49.60.210(1). When a person reasonably believes he or she is opposing

13  discriminatory practices, RCW 49.60.210(1), protects that person whether or not the practice is

14  actually discriminatory. *Ellis v. City of Seattle*, 142 Wash.2d 450, 460-61 (2000); *Graves v. Dep't*

15  *of Game*, 76 Wash.App. 705, 712 (1994) (citing *Gifford v. Atchison, Topeka & Santa Fe Ry*., 685

16  F.2d 1149, 1157 (9th Cir. 1982)).

17      This Court finds Droz has established that her February 2018 comments in her self-

18  assessment for Hoy, as well as her May 2019 formal complaint of discrimination to HR,

19  constitute protected activity under the law.

20      **B.**    **Adverse Employment Action**

21      Second, Droz must show she was subjected to an adverse employment action. Droz again

22  points to the 2016 territory changes, her 2017 "needs improvement" rating, the EA offer, and her

23  2018 and 2019 corrective action plans.

24

REPORT AND RECOMMENDATION - 20

1    For the reasons already discussed, this Court finds Droz has not raised a material question

2 of fact that these were adverse employment actions and consequently Droz cannot establish a

3 prima facie case of retaliation.

4    **C.    Causal Connection**

5    Even assuming Droz had met the burden of showing that BSC committed an adverse

6 employment action, she would still need to demonstrate that her statutorily protected activity was

7 a "substantial factor" in that adverse employment decision. *Allison v. Housing Auth*., 118

8 Wash.2d 79, 821 P.2d 34, 38 (1991). Here, her claim fails as a matter of law because she has not

9 shown her protected activity was a "substantial factor" in an adverse employment decision.

10    After her February 2018 "protected" complaint of gender discrimination in her self-

11 assessment to her 2017 annual review, more than four months elapsed before she received the

12 VCA in July 2018. This lapse of time precludes finding a causal connection and is fatal to her

13 claim. *Moorehead v. Chertoff*, 2:07-CV-01205-RAJ, 2008 WL 4810308, at *4 (W.D. Wash.

14 Nov. 3, 2008) ("a lapse in time of as little as three months can negate a finding of causality based

15 on temporal proximity.").

16    **III.   <u>Constructive Discharge</u>**

17    To establish a claim of constructive discharge a plaintiff must show: (A) the defendant

18 deliberately made working conditions intolerable for the plaintiff; (B) a reasonable person in the

19 plaintiff's position would be forced to resign; and, (C) the employee resigned solely because of

20 the intolerable conditions. *Barnett v. Sequim Vallen Ranch, LLC,* 174 Wash.App. 475, 489

21 (2013).

22    **A.    Deliberate Intolerable Working Conditions**

23    First, Petitioner must prove BSC deliberately made her working conditions intolerable.

24

1    Droz does not address this element and therefore has not created a material

2  question of fact on whether BSC deliberately made her working conditions intolerable.

3  Dkt 65.

4    Courts "presume [the employee's] resignation is voluntary" absent an objective

5  showing of duress or oppressive actions. *Townsend v. Walla Walla Sch. Dist.*, 147

6  Wash.App. 620, 627 (2008).

7    **B.    Reasonable Person Would Have Resigned**

8    Droz argues that a reasonable person in her position, "who complained of harassment and

9  discrimination for years, only to be given unwarranted negative performance reviews, have her

10  territory cut in half, and be placed on corrective actions plans (while similarly situated men were

11  not) would have similarly found the work environment unbearable." Dkt. 54 at 24.

12    Routine performance management is not, as a matter of law, so intolerable as to compel a

13  reasonable person to resign. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir.

14  1994) (low performance marks not "the kind of intolerable act that would force an employee to

15  resign"); *U.S. ex rel. Zemplenyi v. Grp. Health Co-op.*, 2012 WL 1642213, at *5 (W.D. Wash.

16  May 10, 2012) (*citing Brooks*, 229 F.3d at 928, 930) ("performance critiques and suggestions for

17  improvement are part of the ordinary tribulations of the workplace. . . . expectations of and

18  support for improvement are not 'sufficiently extraordinary and egregious' to equal constructive

19  discharge."); *see also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with

20  work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working

21  conditions are not so intolerable as to compel a reasonable person to resign.").

22    This Court finds Droz's contemporaneous responses to the corrective actions

23  mitigate against concluding that a reasonable person would have perceived these actions

24

to be unwarranted, much less unbearable, when even Droz herself did not. For instance, in response to Hoy explaining that Droz's total disposable sales were only growing by 2.4% compared to 8% nationwide, and that her Rhythmia disposable sales were down 2% compared with 36% growth nationwide, Droz responded, "Thanks for sending. Very helpful. I have some wood to chop for sure!" Dkt. 49-23. Then, in a July 10, 2018, email to Crowley, Droz states:

> I had an opportunity to sit down with Hoy this am to review the first part of 2018 (and 2017) and discuss the plan for moving forward in 2018 and how I can work towards hitting plan and making up the delta that exits. As you know from working with me for a few years, making plan is something that I am used to doing. The past year however, has been brutal in relationship to not hitting the plan that was set for me. ***It has been a really good learning experience to know what it is like to not be on top…an now I know [sic]…I don't like it***. With that, I pro-actively created a plan for the remainder of the year on how I plan to make up the Delta [sic] that is before me and surpass the quota for the Seattle Territory. Hoy asked that I send it your way.
>
> Moral of business plan [sic], it will come down to two strategies in order to achieve plan:
>
> 1.      Increase Rhythmia Disposables: At existing accounts Swedish and VM, and gain new Rhythmia accounts Bellingham and Harrison
>
> 2.      Close the Gap on Capital Sales: Both Legacy Capital, Rhythmia, and Service Contracts.
>
> I created some specific strategies and tactics that will get me closer to where we need to be. Would love to hear your thoughts on if you agree with the plan set before you and if you have some other ideas that would help get us closer? Let me know if you would like to discuss live.

Dkt. 49-22 (emphasis in original).

Throughout August 2018, Droz continued to work on ways to improve her performance, and she continued to communicate with Hoy that she was very committed to correcting course.

For example, on August 27, 2018, Droz wrote to Hoy that she was even reaching out to co-workers for ideas:

> As I have told you, I AM WIDE OPEN to suggestions on your thoughts on ways to close the gap. I have chatted with Stanton, Blastic, Fiola, Dyba, Katie, and some other big people in EP on ways to help and improve the numbers. All those have been implemented in my territory [sic], I have increased the case volumes significantly, and yet there is still a large gap in disposables. Any other suggestions are something I would love to hear as I am committed to this territory and to Boston.

Dkt. 49-23 (emphasis in original).

## C. Employee Resigned Solely Due to Intolerable Conditions

BSC has squarely refuted Droz's claim that she resigned because of years of undeserved territory changes and unwarranted negative performance reviews. On this record, no rational trier of fact could conclude Droz was constructively discharged.

## CONCLUSION

The Court recommends Defendant's Motion for Summary Judgment be GRANTED and all the pending Motion to Exclude Expert Testimony (Dkt. 45) be DENIED as moot. Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on February 11, 2021, as noted in the caption.

Dated this 28th day of January, 2021

David W. Christel
United States Magistrate Judge